## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOHN HOLMON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **Case No. 3:18-CV-00514-MAB** |
| ) | |
| HOLLY HAWKINS, ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Plaintiff John Holman, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this suit under 42 U.S.C. § 1983 against Defendant Holly Hawkins ("Hawkins"). Plaintiff claims Hawkins was deliberately indifferent to his serious medical needs while he was incarcerated at Menard Correctional Center ("Menard") (Doc. 1). Now pending before the Court is Hawkins' motion and supporting memorandum for summary judgment (Docs. 42, 43). For the reasons set forth below, the motion for summary judgment will be granted.

### PROCEDURAL BACKGROUND

Plaintiff filed his complaint on March 1, 2018, pursuant to 42 U.S.C. § 1983, alleging that Hawkins acted with deliberate indifference to his serious medical needs (Doc. 1). After a threshold review by this Court, pursuant to 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on one count:

> **Count 1 –** Eighth Amendment deliberate indifference to medical needs claim against Nursing Director Hawkins for refusing to intervene and assist

1

Plaintiff in obtaining prescription refills of his blood pressure medication at Menard in December 2017 and January 2018.

(Doc. 9 at p. 3).

On March 4, 2020, Hawkins filed her motion for summary judgment. (Docs. 42, 43). Plaintiff filed his response to Hawkins' motion for summary judgment on March 16, 2020. (Doc. 46). Hawkins did not file a reply brief.

## FACTUAL BACKGROUND

### A. The Parties

At all times relevant to this case, Plaintiff was incarcerated within the IDOC at Menard. Hawkins was employed as the Director of Nursing at Menard.

### B. Plaintiff's Relevant Medical Care

Plaintiff was diagnosed with hypertension by Dr. Blankenship in 2012 or 2013 when he was first in custody at the Madison County Jail. (Doc. 43-1 at p. 23). He contends he went through an extensive process of trial and error to determine the correct medicine regimen to control his high blood pressure. (*Id.* at p. 24). Ultimately, Plaintiff was transferred to Menard and while there, his medication regimen to control his high blood pressure consisted of Metoprolol, Norvasc, and HcTZ (referred to as a "water pill"). (*Id.* at p. 7; Doc. 43-3 at pp. 115–121). To control the side-effects of these medications, Plaintiff also takes Excedrin Migraine and Pepcid. (*Id.*). Plaintiff's only medication not related to his hypertension was for sinus issues. (Docs. 43-1 at p. 46;. 43-3 at pp. 115–121).

Plaintiff received his medication at Menard in "bubble packs." (Doc. 43-1 at pp. 29–30). These packs were retained by Plaintiff in his cell, and refills were requested by turning in a refill sticker to passing nurses. (*Id.*). Plaintiff testified that each "bubble pack"

2

contains a 30-day supply of a single medication. (*Id.* at p. 33). Plaintiff's medications all came in 30-day "bubble packs" with the exception of his Excedrin migraine, which he was able to get every six days. (*Id.* at pp. 43–44). Typically, Plaintiff explained the refill process at Menard took three days. (*Id.* at p. 34). Plaintiff testified that he would need to sign for each refill when he received a new bubble pack. (*Id.* at p. 36). There are no copies of these signature pages in the record. There is similarly no reference to "bubble packs" in Plaintiff's medical records, but Hawkins' January 3, 2018 memoranda to Plaintiff indicates that he had "keep on person" medication and that he was given pills in 60, 30, and 28 count prescriptions. (Doc. 43-6).

On or about November 27, 2017 Plaintiff testified that he turned refill stickers in for his Norvasc and water pill, HCTZ. (Doc. 43-1 at p. 35). When Plaintiff did not receive refills for all of his medications, he filed a grievance suggesting that he had some, but not all of his medications (*Id.* at p. 36; Doc. 43-6 at o. 15-16). Plaintiff testified he did have doses of his Metoprolol in December of 2017. (Doc. 43-1 at p. 29). Plaintiff alleges that he did not have access to some of his prescription medications until January 2018. (*Id.* at p. 37). Plaintiff alleges that he ran out of Norvasc and HcTZ in the first week of December 2017 and ran out of Metoprolol in the second week of December 2017. (*Id.* at p. 38). Plaintiff describes resuming his prescription regimen sometime in the end of January 2018, around the 20th. (*Id.* at p. 40).

Plaintiff testified that he believes his headaches, nose bleeds, and dizziness were caused by the delay in renewing his high-blood pressure medication, because he had

been told by a "Nurse Marty" in the Madison County Jail in 2012 or 2013 that these were side effects for not being on his medications (Doc. 43-1 at p. 59). Although Plaintiff has a history of migraines, he testified that he was suffering multiple headaches a day while not taking his high-blood pressure medication (*Id.* at pp. 53–54). Plaintiff testified that the headaches he would suffer *while* taking his prescribed high-blood pressure medication without Excedrin migraine were particularly painful. (*Id.* 7, 55). He acknowledged the headaches he experienced without his high-blood pressure medication were not as severe. (*Id.*). Plaintiff further testified he suffered intermittent nose bleeds for a period of a little over a week when he was not taking his blood pressure medication. (*Id.* at pp. 56–57). While Plaintiff's testimony is somewhat vague, it appears the occasional dizziness lasted one or two weeks (*Id.* at pp. 55-57). This was also not the first time he had experienced dizziness. In fact, he experienced this symptom back in 2013 when he was trying to get his various medications figured out (*Id.*). Critically, Plaintiff denies lasting injuries caused by the denial of his prescription medication. (*Id.* at p. 71).

Plaintiff was seen by a Certified Medical Technician ("CMT") on December 11, 2017. (Doc. 43-3 at p. 35). On that date, he signed a medical services refusal form (Doc. 43-3 at p. 85). The form acknowledged that he was refusing medical care and that Dr. Siddiqui had explained the risks and complications of refusing treatment. (*Id.*). Plaintiff's statement on the form references his delay in access to certain medication: "Why am I having such a very hard time receiving my meds from Menard medical staff[?]" (*Id.*). On that date the CMT noted that he needed his Pepcid and Excedrin to manage his blood pressure side-effects. (Doc. 43-3 at p 35). The CMT further noted that Plaintiff was

irritated and refused to pay his co-pay. (*Id.*). On December 21, 2017, Plaintiff was seen by a nurse practitioner where he indicated that he was not taking his blood pressure medications due to the side-effects. (*Id.* at p. 36). Plaintiff told the nurse practitioner that the medications work to control his hypertension but upset his stomach and give him migraines. (*Id.*). Plaintiff's blood pressure was measured on that date as 160/90. (*Id.*) Additionally, Plaintiff was seen on nurse sick call on December 8, 2017; December 11, 2017; December 13, 2017; and December 29, 2017. (Doc. 43-4 at pp. 8, 11, 13, and 29).

Plaintiff was seen at the hypertension clinic on November 16, 2017 where his blood-pressure was noted as 128/72 and stable; it was noted that he was in good control of his condition. (Doc. 43-3 at p. 94–95). When Plaintiff was seen by a nurse practitioner on March 15, 2018, his blood pressure was stable at 134/88, and he was noted as being in control of his hypertension. (Doc. 43-3 at p. 38–39).

Plaintiff claims Hawkins is responsible for his denial of high-blood pressure medication because she was the person who answered his grievances. (Doc. 43-1 at p. 67-69). However, Hawkins's role as Director of Nursing did not include diagnosing patients, prescribing medications, or scheduling inmates for medical appointments. (Doc. 43-2). Hawkins is not a licensed physician and, as such, is not trained to diagnose medical conditions or prescribe medication. (*Id.*). She had no authority to order treatment for any inmate, no authority to refer inmates to specialists, and no authority to order medical examinations or tests. (*Id.*). A treating physician at Menard would have been responsible for making medical decisions for an inmate. (*Id.*). Further, patients have the right to refuse medications, as Plaintiff did on December 11, 2017. (Doc. 43-1 and 43-3 at pg. 85).

Hawkins says, and Plaintiff agrees, that she never met Plaintiff or treated him directly. (Doc. 43-2 and Doc. 43-1 at pp. 65–66).

## C. Plaintiff's Relevant Grievances and Hawkins' Responses

Plaintiff filed multiple grievances indicating that he was not being given his prescriptions. The record reflects Plaintiff filed six (6) relevant grievances, which are as follows: December 11, 2017 (#208-12-17), December 14, 2017 (307-12-17), two filed on January 7, 2018 (#514-1-18(x3)), January 9, 2018 (#514-1-18(x3)), and January 12, 2018 (#307-1-18). (Doc. 43-6).   Hawkins and Dr. Siddiqui responded in four separate memoranda, dated December 15, 2017, January 3, 2018, January 18, 2018, and February 6, 2018. (*Id.*).

Plaintiff's December 11, 2017 suggests that he is receiving some, but not all of his prescriptions (Doc. 43-6, p. 15-16). Plaintiff writes in his grievance to "just stop them all," referring to his prescriptions. (*Id.*)  Plaintiff explained that he was unwilling to suffer side-effects of his prescription medications, so he wanted to "stop them all." He continued, "I am not going to be dealing with no headaches, just to make the medical staff happy." (*Id.*). Hawkins and Dr. Siddiqui responded to this grievance on December 15, 2017. (Doc. 43-6 at p. 14). Their response notes Plaintiff's non-compliance with sick calls and refusal of medical services before notifying Plaintiff that they had scheduled him for the "MD call line to discuss detrimental outcomes of [him] refusing [his medications]" and instructing Plaintiff to refer to Menard's orientation manual for more information on this service. (*Id.*).

Plaintiff filed a second grievance dated December 14, 2017 indicating that he woke up that day with a headache because he had not been given his medication since December 10, 2017. (*Id.* at p. 12–13). Plaintiff again notes he is not able to take all of his medications. (*Id.*) On January 3, 2018, Hawkins and Dr. Siddiqui responded to Plaintiff's December 14 grievance. (*Id.* at p. 11). In their response, Hawkins and Dr. Siddiqui indicate that they received Plaintiff's grievance, reviewed his record, and believe he has medication based on their records. (*Id.*) They further list the "keep on person" prescriptions in possession of the Plaintiff as follows: 60 count of pain medications refilled on 10/30/17, 30 count of Norvasc on 11/11/17, 28 count of Pepcid on 11/7/17, 30 count of HcT2 on 11/7/17, and 30 count of Metoprolol on 11/30/17. (*Id.*). The response also indicates that Plaintiff received refills for these medications in December (*Id.*). Finally, the response noted that if there are any further medical problems, Plaintiff should put in for nurse sick call so that the issues can be addressed.

Plaintiff filed two grievances on January 7 and another on January 9, both related to his medications. (*Id.* at pp. 4–7). One of the January 7 grievances mentions that Plaintiff returned his refill tabs in early December for his Norvasc and HcTZ. (*Id.* at p. 4). Plaintiff notes that he retained his empty "bubble packs" to prove that his prescriptions had not been renewed. (*Id.* at p. 5). Plaintiff further indicates that his Norvasc advised a refill by 12/2/17 and that his HcTZ advised a refill by 11/16/2017. (*Id.*) The second January 7 grievance relates to a shakedown of his call on January 4, 2018. (*Id.* at pp. 6–7). Plaintiff suggests that the shakedown was to prove that he was in possession of his prescriptions, but was fruitless. (*Id.* at p. 6). Plaintiff's January 9 grievance is again complaining about

7

not receiving refills for his prescribed medications. (*Id.* at p. 1–2). It also indicates that Plaintiff is having headaches and nosebleeds. (*Id.*) Hawkins and Dr. Siddiqui prepared a memorandum on January 18 indicating that they had received the January 7 and 9 grievances, and that the problem was already addressed in Plaintiff's prior grievance response. (*Id.* at p. 3).

Plaintiff filed another grievance on January 12, 2018 (*Id.* at pp. 8–9). Here, Plaintiff was primarily focused on voicing his frustration with the delay and what he believed to be unprofessional behavior and threatening to notify the Governor of Illinois and the news media about the issue (*Id.*). At the end of the grievance, Plaintiff noted that no one has checked his blood pressure during the whole time he has been grieving about his medications (*Id.*). On February 6, 2018, Hawkins and Dr. Siddiqui prepared another memorandum to Plaintiff indicating that they were in receipt of his January 12 complaint and that it was already addressed. (*Id.* at p. 10). They instructed Plaintiff to request sick call if he needed medical attention. (*Id.*)

### D. Menard Pharmacy Records

The pharmacy records provided by Menard indicate that Plaintiff's prescriptions were filled in November 2017, December 2017, and January 2018. (Doc. 43-5 at pp. 9–10). Specifically, 30 doses of HcTZ (Hydrochlorothiazide) was refilled on 11/4/17, 12/9/17, and 1/8/18. (Doc. 43-5 at p. 9). 30 doses of Norvasc (Amlodipine) were filled on 11/10/17, 12/9/17, and 1/8/18. (*Id.*). 30 doses of Metoprolol were filled on 11/28/17, 12/30/17, and 1/23/18. (*Id.*). Pepcid (Famatodine) is recorded as being filled on 11/4/17, 12/22/17, and 1/13/18. (*Id.*) 60 doses of Excedrin Migraine (Pain Reliever Plus) were

filled on 12/23/17, and 1/13/18. (*Id.* at pp. 9–10). The pharmacy records also reflect handwritten refill slips for Norvasc, HCTZ, "Tprol XL" (sic.), Pepcid, and Claritin on January 6 2018. (*Id.* at p. 2).

## LEGAL STANDARDS

Summary judgement is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalo v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted).

In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, but instead to determine whether there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). In deciding a motion for summary judgment, "[a] court may not . . . choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted).

ANALYSIS

The Supreme Court has held deliberate indifference to the serious medical needs of prisoners may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex. Rel. Nyman v. Winnebego Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the Plaintiff must demonstrate that he suffered from an objectively serious medical condition. *Id.* at 591–92. And second, the Plaintiff must establish that the individual prison officials were deliberately indifferent to that condition. *Id.*

## I.      Serious Medical Condition

An objectively serious medical condition is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious even a lay person would easily recognize the necessity for a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). Hypertension is a serious condition and if untreated it can result heart disease.[1] *See Jackson v. Pollion*, 733 F.3d 786, 789–90 (7th Cir. 2013). When the Plaintiff's claim focuses on a delay in treatment, however, the Seventh Circuit has noted that the "objective seriousness" of the plaintiff's medical condition should also consider the medical consequences of the delay. *Id*. ("But if they were going to venture an opinion on

---

[1] Hypertension, or high blood pressure, is a common condition "in which the long-term force of the blood against your artery walls is high enough that it may eventually cause health problems, such as heart disease." High     Blood     Pressure,     https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/symptoms-causes/syc-20373410 (last visited March 25, 2021).

the 'objective seriousness' of the plaintiff's 'medical condition,' they had to get the condition right—which was not hypertension but the medical consequences, in fact negligible, of a three-week deprivation of medicine for mild, early-stage hypertension.").

Plaintiff testified he suffered from headaches, dizziness, and nose bleeds and he believes these were caused from the delay in his medication. But Plaintiff, by his own admission, confirmed he has not suffered any *lasting* injuries from the delay in treatment (Doc. 43-1, p. 71). Additionally, Plaintiff testified the nose bleeds lasted a little over a week and he had a history of migraines *prior* to any delay in his medication (*Id*. at pp. 53-56). In fact, the headaches he experienced while on his medication were more severe than the headaches he experienced during the delay. And the occasional dizziness lasted one or two weeks, and here too, Plaintiff had experienced dizziness on a prior occasion while on medication. While hypertension is certainly a serious condition, the symptoms Plaintiff experienced during the delay in medication were not the type that are so obvious that even a lay person would recognize the necessity for a doctor's attention. But the condition of hypertension and the symptoms, in tandem, give the Court concern.  For purposes of the instant motion for summary judgment, the Court will assume that Plaintiff has satisfied the objective component.

## II.    Deliberate Indifference

To show that prison officials acted with deliberate indifference, plaintiff must put forth evidence that the prison officials knew that the prisoner's medical condition posed a serious health risk, but they consciously disregarded that risk. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "This subjective standard requires more

than negligence and it approaches intentional wrongdoing." *Id.*; *accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("Deliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence does not violate the Constitution.").

"In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required **\*715** the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007). In other words, "a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Id*. Certainly, expert testimony would constitute acceptable medical evidence, but that is not the only form of verifiable medical evidence that a plaintiff can use to get past summary judgment on a case like this. *See Liefer*, 491 F.3d at 715 (finding the plaintiff offered sufficient medical evidence to satisfy the objective prong through the use of medical records and plaintiff's own testimony about his symptoms, care, treatment, and injuries).

In delayed treatment cases, the Seventh Circuit has stated:

> No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury. For there is no tort—common law, statutory, or constitutional—without an injury, actual or at least probabilistic.

*Jackson*, 733 F.3d at 790; *Deblasio*, 2020 WL 133084 at *8 (plaintiff failed to present evidence that he suffered any "long-term consequences" or other harm caused by the delay in treating his sometimes-elevated blood pressure).

Plaintiff testified he suffered from headaches, dizziness, and nose bleeds and he believes these were caused from the delay in his medication. The Plaintiff also relies on a general statement by a nurse in 2012 or 2013. The general statement he attributes to a "Nurse Marty" in 2012 or 2013 about his symptoms is not admissible evidence (its hearsay) and even if it was, it is far too vague, general, and speculative to assist Plaintiff here. Moreover, Plaintiff, by his own admission, confirmed he has not suffered any lasting injuries from the delay in treatment (Doc. 43-1, p. 71). Additionally, Plaintiff testified the nose bleeds lasted a little over a week and he had a history of migraines prior to any delay in his medication (*Id*. at pp. 53-56). In fact, the headaches he experienced *before the delay* in his medication were *more severe* than the headaches he experienced while his medication was delayed. And the occasional dizziness lasted one or two weeks, tops and here too, Plaintiff had experienced dizziness on a prior occasion while on medication. In short, its unclear whether any of these symptoms were caused by the delay in treatment or just side effects of his hypertension, in general. Moreover, there is no verifiable evidence connecting the delay to any long-term consequences or harm to Plaintiff. Plaintiff was seen in March 2018 (after the delay and his medications had resumed) and his blood pressure was stable at 134/88, and he was noted as being *in control* of his hypertension. (Doc. 43-3 at p. 38–39). Even crediting Plaintiff's speculative

13

testimony, the inconveniences he incurred were short and temporary and headaches and dizziness had predated any delay.

And even so, there is simply no evidence to suggest that Hawkins acted with a sufficiently culpable state of mind. *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) ("to be deliberately indifferent, the defendants must have acted with 'a sufficiently culpable state of mind.'") (citation omitted). In Eighth Amendment claims arising from a prisoner's medical care, a non-medical prison official will generally be justified in believing the prisoner is in capable hands. *Hayes v. Snyder*, 546 F.3d 516, 526–527 (7th Cir. 2008); *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) ("Perhaps it would be a different matter if [the non-medical prison official] had ignored [the plaintiff's] complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address [the plaintiff's] concerns."). A non-medical defendant will be entitled to summary judgment when she reasonably responds to the inmate's complaint or grievance and defers to the professional judgment of the facility's medical officials. *Id.*; *Johnson*, 433 F.3d at 1010-12.

Hawkins' position at Menard was an administrative one. (Doc. 43-2). She had no authority to prescribe medicine or courses of treatment to any inmate. (*Id.*). In fact, she did not treat or diagnose any patient/inmates nor did she prescribe, fill or give out any medications to any inmates (*Id.*). Nor did Hawkins have any authority to order any form of treatment for an inmate (*Id.*). In short, Hawkins did not provide any form of medical care or treatment to Plaintiff (*Id.*; Doc. 43-1 at 66.). Rather, Hawkins investigated Plaintiff's

14

grievances and provided responses to him about his care with the aid of Dr. Siddiqui. (Doc. 43-6). Hawkins recommended that Plaintiff be seen in the MD sick call line and referred him several times to Menard's procedures for continuing medical concerns. (*Id*.). In short, Hawkins' affidavit makes clear even though she was the Director of Nursing, she was not a medical professional and her role was purely administrative.

Hawkins received and addressed Plaintiff's relevant grievances by reviewing his medical chart with Dr. Siddiqui. (Doc. 43-6). She further provided response memoranda to Plaintiff addressing his concerns on December 15, 2017, January 3, 2018, January 18, 2018, and February 6, 2018. (*Id*.). Hawkins' December 15 memorandum discussed Plaintiff's unwillingness to take his medication (mentioned in Plaintiff's December 11, 2017 grievance), Plaintiff's habit of getting angry at sick call and refusing medical services, and scheduled Plaintiff for a physician medical call to discuss detrimental effects of not taking his medication. (*Id*.). After each relevant grievance, Hawkins ensured that Plaintiff was receiving the medical care he requested and verified that his prescriptions were up to date. (*Id*.). In her January 3, 2018 memorandum, Hawkins noted that Plaintiff's medications were filled in November 2017, December of 2017, and January 2018 according to his medical records.[2] (*Id*.). Hawkins did not ignore the Plaintiff's grievances or medical needs. Rather, the records demonstrate she acted reasonably and responded to each grievance and verified medical records in her responses. In responding to

---

[2] Menard Pharmacy records corroborate Hawkins' memorandum show that Plaintiff's prescription medications were filled in November 2017, December 2017, and January 2018 as scheduled. (Doc. 43-5 at p. 9–10).

Plaintiff's grievances, Hawkins consulted with Dr. Sidiqqui extensively and relied on him.

Ultimately, no reasonable jury could conclude that Hawkins acted with deliberate indifference in responding to Plaintiff's complaints. Rather, the facts demonstrate she investigated Plaintiff's complaints, responded to his complaints, and consulted with and deferred to medical professionals. *Johnson*, 433 F.3d at 1011 (non-medical professional "insulated from liability because he 'responded reasonably' to [plaintiff's] complaint."); *Hayes*, 546 F.3d 516 (non-medical personnel entitled to summary judgment when they "responded readily and promptly" to each of the plaintiff's letters and grievances). Accordingly, Hawkins is entitled to summary judgment.

## III.   Qualified Immunity

Hawkins argues that she is entitled to qualified Immunity, because Plaintiff cannot establish that she violated his Eighth Amendment rights. (Doc. 43, pp. 17–18).

Qualified immunity "protects government agents from liability when their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (citing *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010)). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The test for qualified immunity has two prongs: (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the official's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232. *See also Brosseau v. Haugen*, 543 U.S. 194, 197 (2004); and *Wilson v. Layne*, 526 U.S. 603, 609 (1999). "If either inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (quoting *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017)).

A clearly established right is one that is "defined so clearly that every reasonable official would have understood that what he was doing violated that right." *Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). There does not need to be a case directly analogous, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The right must be "particularized" such that the "contours" of it are clear to a reasonable official. *Reichle*, 566 U.S. at 644. "[T]he Seventh Circuit has long held that 'the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted.'" *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (quoting *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987)). No clearly established right was violated here.

For the reasons stated above, the Court finds that Hawkins is entitled to qualified immunity because, even where the facts are taken in the light most favorable to Plaintiff, she engaged in no conduct that violated Plaintiff's constitutionally-protected rights.

CONCLUSION

For the above stated reasons, Defendant's motion for summary judgment (Doc.

42) is **GRANTED** and this action is **DISMISSED with prejudice**. The Clerk of Court is

**DIRECTED** to enter judgment in favor of Defendant Holly Hawkins and against

Plaintiff John Holmon and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: March 25, 2021**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**

18